No. 23-50444

# In the United States Court of Appeals
## for the Fifth Circuit

ROBERT WHITE
PLAINTIFF—APPELLEE

V.

PATRIOT ERECTORS, L.L.C.
DEFENDANT—APPELLANT

———————————————

On Appeal from the United States District Court
Western District of Texas, Austin Division
C.A. NO. 1:20-cv-1219

———————————————

**OPENING BRIEF OF APPELLANT**

———————————————

Kane Russell Logan Coleman PC
Andrea M. Johnson TBN 10679600
5151 San Felipe Street, Suite 800
Houston, Texas 77056
Telephone: (713) 425-7433
Fax: (713) 425-7700

**Attorney for Appellant
Patriot Erectors LLC**

**ORAL ARGUMENT REQUESTED**

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5th Cir. R. 28.2.1, the undersigned counsel of record certifies that the following list of persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| District Judge: | Hon. Robert Pitman |
| Appellant: | Patriot Erecters LLC |
| Counsel for Appellant: | Andrea M. Johnson |
| Appellee: | Robert White |
| Counsel for Appellee: | Kell A. Simon |

*/s/ Andrea M. Johnson*
Andrea M. Johnson

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument before this Court. Although Appellant represents that the facts and legal arguments are thoroughly presented in this brief and in the record, Appellant believes that the decisional process of this Court will benefit from oral argument about key legal and fact issues of importance in this case. Such argument will illuminate these issues and provide factual context for the particular evidence presented in this discrimination lawsuit. Accordingly, Appellant requests an oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES.........................................iii

STATEMENT REGARDING ORAL ARGUMENT .................................iv

TABLE OF CONTENTS.................................................................v

TABLE OF AUTHORITIES...................................................... x

SUBJECT MATTER AND APPELLATE JURISDICTION ..................... 1

STATEMENT OF ISSUES................................................... 2

STATEMENT OF THE CASE ............................................... 3

    I.    Procedural History ................................................. 3

    II.    Statement of Facts ............................................... 5

        A.    Patriot, Robert White, and Parley Dixon. .................... 5

        B.    Patriot's Write-ups about Robert's Troubling
            Interaction with Subordinates.................................... 6

        C.    Robert's Personal Problems and Patriot's
            Reorganization. ............................................. 7

        D.    2019 Changes at Patriot. ............................... 8

E.    Patriot's 2019 Acquisition of Trinity Steel, a
Fabrication Expert, and Patriot's Request that
Trinity's Mickey Swor Come to Patriot's Fab Shop for
an Assessment and for Recommendations of
Improvement. ................................................................. 9

F.    Robert's 2019 Accident with a Patriot Truck. ............. 10

G.    CEO Parley Dixon, Robert's Friend, Observed Robert's
Stress. ........................................................................... 10

H.    The Reported Racial Slur and Mickey's
Investigation. ............................................................... 11

I.    What Mickey Concluded about the Fab Shop Overall
and about Robert, and What Mickey Told Parley. ...... 12

J.    Parley Is Concerned about Robert Personally, Talks
with Robert, Offers Him Paid Leave to Sort Things
Out, and Offers Him Three Possible Job Options. ...... 17

K.    The Management Change with Robert Was One of
Many Within Patriot, as to Processes and Personnel;
Robert Was Not Alone—Several Others Also Were
Moved during the Reorganization. ............................. 19

L.    Texts and Emails Demonstrate that Patriot Hoped
Robert Would Stay, and Robert Talked about the
Prospect of a Possible Sales Job at Patriot. ................. 20

M.    Robert Goes in a Different Direction. ......................... 21

N.   Justin Snyder, Biracial Like Robert, Became the Shop
     Manager ............................................................... 23

O.   Robert's Intentions Were Clear from the Very Start; He
     Quickly Formed His Company Phynix, and Then with
     Patriot Representatives Only Talked about Its Start
     and How to Best Get It Going as a Business. ............. 23

P.   Patriot's Progressive Discipline Policy and Its
     Inapplicability to Robert. ........................................ 24

Q.   Patriot Sends Work to Phynix. .................................. 26

R.   Robert Never Complained about Discrimination or
     Retaliation, or that the Company Failed to Follow Its
     Policies as to Him. .................................................. 26

S.   COVID and Its Unfortunate Effect on Both Patriot and
     Phynix. ................................................................... 28

T.   The TWC Claim Was Also Silent about Discrimination
     and Retaliation. ...................................................... 29

U.   Discrimination Lawsuit Filed Only after Phynix Was
     Not Successful. ....................................................... 29

STANDARD OF REVIEW ...................................................... 30

I.   Standard of review for a directed verdict ............................... 30

II.  Standard of review for a jury verdict .................................... 31

SUMMARY OF THE ARGUMENT .............................................. 31

ARGUMENT AND AUTHORITIES ....................................................... 32

I.    The Same Standards for Title VII and §1981 Claims. .................. 32

II.   The *McDonnell Douglas* Framework Applies. ............................... 33

III.  Mr. White Did Not Establish a *Prima Facie* Case of Race
      Discrimination. ................................................................. 34

      A.    No Replacement by a Person Outside of the Mr.
            White's Protected Class. ............................................. 34

      B.    Mr. White Quit and Was Not Terminated ............... 35

IV.   Mr. White Did Not Sustain His Burden to Prove that Patriot
      Discriminated against Him ................................................. 36

      A.    No Evidence of Discrimination ............................. 36

      B.    Plaintiff's Much Later Developed Opinion about
            Discrimination Is Insufficient as a Matter Of Law ....38

V.    This Is A Case of Company Reorganization, Not a Termination
      Targeted against Mr. White Due to His Race; He Instead Chose to
      Leave Patriot and Start His Own Business ........................... 40

VI.   Patriot's Legitimate Business Decision Cannot be Second-
      Guessed; Patriot Had Every Right to Rely on Trinity's Fabrication
      Experience and on Mickey Swor and His
      Expertise ........................................................................ 42

VII.  Patriot's "Progressive Discipline" Policy Is Inapplicable; Mr. White Was Not Being Managed out of a Job, and There Is No Evidence of Discriminatory Application, in Any Case................................43

VIII. Mr. White's Resignation Is Not Actionable; No Constructive Discharge. ........................................................................ 46

IX.   Even if Mr. White Was "Discharged," Patriot Had a Legitimate Business Reason for Doing So........................................ 47

X.    Mr. White Has No Substantial Evidence of Pretext. ................... 48

    A.    No Racially Charged Statements by the Decision-Makers........................................................................ 51

    B.    No Evidence of a Comparator Being Treated Differently. ................................................................ 51

    C.    No Evidence of "Sabotage." ........................................ 52

    D.    No Retaliation. ............................................................ 52

    E.    Not a Case of a Failure to Investigate Properly..........52

    F.    This Is Not a Case of Inconsistent Reasons. ...............54

    G.    The Similarity to the *Owens* Case. ..............................56

CONCLUSION ..................................................................57

CERTIFICATE OF SERVICE..................................................59

CERTIFICATE OF COMPLIANCE..........................................60

# TABLE OF AUTHORITIES

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151
(2000) ................................................................. 30, 47, 55

*Adams v. Lucent Techs., Inc.*, 284 Fed. Appx. 296, 301-02
(6th Cir. 2008) ................................................................. 35

*Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152
(5th Cir. 1995) ................................................................. 40

*Arthur J. Gallagher & Co. v. Babcock,* 703 F.3d 284, 292-93
(5th Cir.2012)................................................................. 30

*Baker v. American Air., Inc.,* 430 F.3d 750, 754
(5th Cir. 2005)……………………………………………36, 38, 48

*Barnes v. Bd. of Tr. of Univ. of Ill.*, 946 F.3d 384, 389-90
(7th Cir. 2020) ................................................................. 49

*Black v. Mississippi Dept. of Rehab. Servs.,* No. 2260409,
2023 WL 4341459, at *2 (5th Cir. July 5, 2023) .................. 36

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969)......... 30

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)........... 46

*Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478
(5th Cir. 2005) ................................................................. 55

*Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425
(5th Cir. 2000) ................................................................. 33

*Cherry v. Premier Prints, Inc.,* No. 1:21-CV-59-SA-DAS,
2022 WL 3636606, at *9 (N.D. Miss. Aug. 23, 2022)…….. 33, 40, 50, 55

*Cromwell v. Boa Vida Hosp. of Aberdeen, MS, L.L.C.*, No. 22-60109,
2023 WL 2535739, at *2 (5th Cir. March 16, 2023)................ 36

*Culley v. West Bolivar Consol. Sch. Dist.*, No. 4:20-CV-190,
2023 WL 5007871, at *5-6 (N.D. Miss. Aug. 4, 2023).................. 31,51,52

*Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 817-18
(S.D. Tex. 1998) ...................................................................... 40

*Edwin v. Clean Harbors Environmental Servs. Inc.*, No. 22-30263, 2023
WL 4046275, at *3 (5th Cir. June 16, 2023)……………………..…………37

*Esparza v. Advanced Network Man., Inc.,* No. EP-21-CV-199-KC,
2023 WL 5419810, at *6 (W.D. Tex. Aug. 22, 2023) ................................ 46

*Eyob v. Mitsubishi Caterpillar Forklift America, Inc.*,
745 Fed. Appx. 209, 211-12 (5th Cir. 2019) ................................ 42, 45, 46

*Forbis v. Exeter Fin., L.L.C.*, No. 22-10193, 2022 WL 17986689,
at *4 (5th Cir. Dec. 29, 2022) ........................................................... 37, 40

*Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002)................................54

*Godfrey v. Katy Indep. Sch. Dist.*, 395 Fed. Appx. 88, 91
(5th Cir. 2010) ...................................................................... 48

*Harville v. City of Houston*, 945 F.3d 870, 877 (5th Cir. 2019) .............. 48

*Huffman v. Union Pac. R.R.,* 675 F.3d 412, 425 (5th Cir. 2012)............... 31

*January v. Huntsville*, 74 F.4th 646, 655 (5th Cir. 2023) ...................... 49

*Jeffries v. Barr,* 965 F.3d 843, 863 (D.C. Cir. 2020) .............................. 34

*Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342-43 (5th 2005) ....... 35

*King v. Armstrong World Industries, Inc.,* 906 F.2d 1022, 1027
(5th Cir. 1990)...................................................................... 31

*Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) ........................... 49

*LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391
(5th Cir. 2007) ..................................................................... 40

*Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 901
(E.D. Tex. 2004) ................................................................... 32

*Loehr v. Offshore Logistics, Inc.*, 691 F.2d 758, 760 (5th Cir. 1982) ......... 31

*Lyons v. Katy Ind. Sch. Dist.*, 964 F.3d 298, 306-07 (5th Cir. 2020) ...... 38

*Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 483-84
(5th Cir. 2023) ..................................................................... 36

*Nygren v. Dollar Tree, Inc.*, Civ. Action No. 20-2714, 2021
WL 3741526, at *12 (E.D. La. Aug. 24, 2021)......................................... 42

*Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 515
(5th Cir. 2001). ..................................................................... 37

*Owens v. Circassia Pharma., Inc.*, 33 F.4th 814, 825
(5th Cir. 2022)................................................. 32-34,37, 39,40,48,49,50-56

*Pennucci-Anderson v. Ochsner Health Sys.*, 2021 WL 242862,
at *3, 5 (E.D. La. Jan. 25, 2021)........................................... 42-43, 48, 51

*Quinn v. St. Louis Cnty*, 653 Fed. 745, (8th Cir. 2011) .......................... 35

*Ross v. Perry, Ga.*, 395 Fed. Appx. 668, 670 (11th Cir. 2010) ............... 55

*Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 391
(5th Cir. 2020) ..................................................................... 46, 55

*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899
(5th Cir. 2002).....................................................................33, 55

*Sun v. Tetra Techs., Inc.*, No. 22-20646, 2023 WL 689227, at *2
(5th Cir. Oct. 19, 2023)........................................................... 45, 50, 51

*Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1159 (10th Cir. 2008) ................ 53

*Turner v. Baylor Richardson Med. Cntr.*, 476 F.3d 337, 346
(5th Cir. 2007) ...................................................................... 45

*Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) ...... 48

*Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997) ..................... 47

*Wright v. United Parcel Serv., Inc.*, 842 Fed. Appx. 869, 872-73
(5th Cir. 2021) ...................................................................... 34

## Statutes

42 U.S.C. §1981 ................................................................ 2, 3, 32

28 U.S.C. §1331 ...................................................................... 1

28 U.S.C. §1291 ...................................................................... 1

42 U.S.C. §2000e(2)(a)(1) ........................................................... 2

## Rules

Fed. R. App. P. 4(a)(1)(A ............................................................ 1

Fed. R. App. P. 32(s)(7)(B)(i) ..................................................... 60

Fed. R. App. P. 32(a)(5) ........................................................... 60

## SUBJECT MATTER AND APPELLATE JURISDICTION

**Subject Matter Jurisdiction in the District Court**.    On December 15, 2020, Appellee, Robert White ("Mr. White" or "Robert"), filed this action in the U.S. District Court for the Western District of Texas, Austin Division, pursuant to 28 U.S.C. §1331. ROA.10-15.

**Jurisdiction in the Court of Appeals.**  This is a direct appeal from a final decision of the U. S. District for the Western District of Texas, Austin Division.  This Court has jurisdiction of the appeal.  *See* 28 U.S.C. §1291.  The district court entered a Final Judgment on February 27, 2023.  ROA.698-99. Thereafter, Patriot filed a motion for new trial on March 27, 2023.  ROA.932-42. The district court denied the motion for new trial, on May 11, 2023. ROA.1521-37. The order also disposed of the Appellee's motion for attorneys' fees. ROA.1521-37. Appellant filed its Notice of Appeal on June 12, 2023, 2023. ROA.1538-39. This case is properly before the U. S. Court of Appeals for the Fifth Circuit.  *See* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. The district court erred when it denied the motion for directed verdict of Patriot Erectors LLC ("Patriot" or "Company") because the evidence was insufficient to support a claim of discrimination under either 42 U.S.C. §2000e(2)(a)(1) ("Title VII") or 42 U.S.C. §1981 ("§1981").

2. Alternatively, the evidence does not support a finding that Patriot's actions were discriminatory as to Appellee, Robert White, and, thus the jury finding of discrimination must be reversed and no damages awarded to Mr. White.

## STATEMENT OF THE CASE

### I.    Procedural History

Appellee Robert White ("Mr. White" or "Robert") filed the underlying suit against Patriot Erectors, alleging that he was discriminated against and/or retaliated against as an employee, citing claims under Title VII and 42 U.S.C. § 1981. ROA.10-15. He claimed that his departure from Patriot was due to a discriminatory adverse action and/or due to retaliation for his complaint about a racial slur.  He sought compensatory damages, including back pay, front pay, punitive damages, and attorneys' fees.  ROA.14.

Patriot filed its answer, denying the allegations and raising certain affirmative defenses. ROA.18-23. The trial court denied Patriot's motion for summary judgment.  ROA.505-527. ROA.528-29. The case went to trial in front of a jury, starting on January 17, 2023, and ending on January 20, 2023.

At the close of evidence, Patriot moved for a directed verdict. ROA.2107-72. The court denied the motion. ROA.2171-72. The jury returned a verdict on January 20, 2023, finding for Mr. White as to the discrimination claim, but not the retaliation claim.  ROA.689-91. The

district court did not submit punitive damages. ROA.2192. The jury found that Mr. White had suffered an adverse employment action, due to race. ROA.689. The jury awarded damages for wages and benefits, but not as to other requested compensatory damages, such as pain and suffering. ROA.690. The jury found that Mr. White had "not failed to reduce his damage through the exercise of diligence." ROA.691. The district entered a judgment based on the jury's findings. ROA.698-99.

Thereafter, Patriot filed a motion for new trial on March 27, 2023. ROA.932-42. The district court denied the motion for new trial, on May 11, 2023. ROA.1521-37. The order also disposed of the Appellee's motion for attorneys' fees. ROA.1521-37. Appellant filed its Notice of Appeal on June 12, 2023, 2023. ROA.1538-39.

The district court entered a final judgment on February 27, 2023. ROA.698-99. On May 11, 2023, the court denied Patriot's motion for new trial filed on March 27, 2023 (ROA.932-42). ROA.1521-37. Patriot filed its notice of appeal on June 12, 2023. ROA.1538-39. This appeal then followed.

## II.     Statement of Facts

### A.     Patriot, Robert White, and Parley Dixon.

Patriot's business is focused on erecting steel for commercial buildings and fabricating steel components for those projects. ROA.1644,1645. ROA.1708. ROA.1837-38. ROA.1840. In 2019, Robert White was the manager of Patriot's Dripping Springs fabrication shop ("Fab Shop" or "Shop"). ROA.1840. Parley Dixon ("Parley") has worked at Patriot for 32 years, from craft worker to CEO. ROA.1837-38. During that time, the Company grew significantly, including adding the Fab Shop, starting in 2000-09. ROA.1838-39.

In July 2010, Robert started as a Patriot welder. ROA.2065. Patriot brought him on board despite his "ex-con" background. ROA.1879 (Parley believes in giving people second changes). ROA.1879. The Company promoted him and gave him a number of pay raises over the years; he earned it. ROA.1879. Robert said Patriot "saved his life," and he was the first "ex-con" hired. ROA.2067. ROA.2076. He received bonuses too, dependent on overall Company success and reflecting trailing financial periods. ROA.1919-20. ROA.2068. Eventually, Mr. White was made the Shop Manager, a job he held from 2013-19, and he was a part of the

reason the Company grew. ROA.1840. Mr. White had access to a company vehicle and was entrusted with a gas and visa card. ROA.2068. He was permitted to work on personal projects such as a jacked-up vehicle (ROA.1907-08), and he was allowed to use a trailer on property without cost, and all of these advantages were deemed "useful" by Robert. ROA.2067-68. Additionally, the Company helped him with some issues concerning one of his adopted children. ROA.2081-82.

B. **Patriot's Write-ups about Robert's Troubling Interaction with Subordinates**.

In 2018, Patriot management received several lengthy complaints from various employees regarding Robert's lack of professionalism as well his perceived aggressive and harassing management style. ROA.1738-39. ROA.2070. ROA.2379-90. These investigated complaints resulted in Robert being reprimanded. ROA.1738-39. ROA.2395. Robert had already been written up once in 2017. ROA.2374. The Company issued a written warning (his second) that his behavior had to improve (or "possible termination" could occur). ROA.1738-39. ROA.2068-70. ROA.2395. Had he received a third written warning, he could have been terminated. ROA.2569. But, the Company did not issue a third notice, even when Mickey Swor ("Mickey"), his supervisor in later 2019, heard

complaints about Mr. White's "job scared" approach to employees. ROA.2072.

### C.  Robert's Personal Problems and Patriot's Reorganization.

This case is not just about what happened at Patriot as a business in 2018-19, but what was happening to Robert, personally.

In 2019, Robert was involved in an extramarital affair with a co-worker, Maryann Ezell.    ROA.2038. Robert's wife called Parley to complain loudly about the affair.    ROA.1857-58. At work, Mr. White denied the affair to colleagues (*see, e.g.*, ROA.2414).   The affair led to some difficult divorce proceedings between Robert and his wife, Yolanda, who claimed adultery, and the divorce was finalized in November 2019. ROA.2038-30. ROA.2074.  In addition to the divorce issues, Robert and his former wife had several children, both adopted and theirs by birth, and he had considerable child-support obligations. ROA.2075.  In 2019, Mr. White sometimes lived with Ms. Ezell, or from time to time he lived in a trailer at the Patriot work site (without charge or rent, ROA.2008). ROA.2068. ROA.1861.

White's personal issues came to a crescendo in 2019 at the same time there was a massive reorganization at Patriot.    ROA.1839-1840.

Parley termed the time period as "controlled chaos." ROA.1893. It was, in a sense, a perfect storm for Robert—lots of changes at work along with intense personal pressures. ROA.1993-94. They are also a backdrop to explain in part why Patriot, through Robert's friend, Parley (ROA.1859), a person whom Robert admits he "loved" (ROA.2075-76), took the particular steps he did concerning Robert in late October 2019. ROA.1844-45. ROA.1873. ROA.1854.

**D.    2019 Changes at Patriot.**

In March 2019, Patriot significantly expanded its operations through its acquisition of Trinity Steel Fabricators ("Trinity"). ROA.1843. This addition came after a private equity investment recapitalized the Company. ROA.1842. Parley referred to the time period as "like herding cats." ROA.1842. There were many changes, including merging Trinity with Patriot, introducing new systems and manufacturing processes, reorganizing its structure, determining what roles its employees should do based on their talents (which meant movement of some people in the organization), and bringing in modern software that would help regulate process in the shop (the computer program Patriot used was years old, antiquated, and DOS-based). ROA.1842-43.

**E.    Patriot's 2019 Acquisition of Trinity Steel, a Fabrication Expert, and Patriot's Request that Trinity's Mickey Swor Come to Patriot's Fab Shop for an Assessment and for Recommendations of Improvement.**

In 2019, Patriot welcomed Trinity, its fabrication expertise, and management.    Patriot acquired Trinity because it was a well-run fabrication business, efficient and effective; this was so due in large part to the fact that Trinity was solely a fabrication company, doing no erection, and, as a result, Patriot asked Mickey to help assess the Fab Shop because he had years of experience with Trinity's process-driven environment.  ROA.1705-08.  Mickey compared processes in fabrication to an instruction book.  ROA.1705.  At Parley's request, Mickey came to Dripping Springs in July 2019.  ROA.1709. ROA.1845. ROA.1894-96.

When Mickey arrived at Patriot in July 2019, he was first like a consultant coming to a company to review what changes might be necessary, if any, to take Patriot to the next level.  ROA.1643. ROA.1649. ROA.1673 ("my purpose was to evaluate the shop").  ROA.1845.  He came to review and effect organizational change, as needed ("to bring it up to the level we needed as a larger company").  ROA.1712. ROA.1718. ROA.1845.  Parley wanted Mickey "to help [Patriot] organize that

structure, play a better game, be more precise, establish some rules and boundaries, and remove some of the ad hoc experiences that had been going on." ROA.1845. ROA.1894-96. Parley termed Mickey a "systems guy." ROA.1895. Parley received hundreds of emails from Mickey about his concerns about the Shop overall. ROA.1850.

## F. Robert's 2019 Accident with a Patriot Truck.

While all these personal and business changes were occurring in 2019, Robert also was involved in a major accident while operating a Patriot truck (with some of his children in the truck as well). ROA.1856-57. It appeared that Robert fell asleep at the wheel. ROA.1857. No one was hurt in the accident. ROA.1859. ROA.1878. ROA.1880-81. Though the accident was serious, Parley did not consider the accident a "nefarious act," and Robert was not fired or written up. ROA.1881. The Company, when Mickey Swor ("Mickey") was his boss, gave him a second chance. ROA.1881.

## G. CEO Parley Dixon, Robert's Friend, Observed Robert's Stress.

Parley daily saw Robert, and sometimes they attended meetings together. ROA.1841-42. In the September-October 2019 time, Parley saw

a man stressed to the limit.  ROA.1858. ROA.1873-74.  Parley had talked to him then about getting more rest.  ROA.1858.

### H. The Reported Racial Slur and Mickey's Investigation.

In September 2019, Ms. Ezell (White's paramour) told Robert that another Patriot employee, Renee Deselle, reportedly *told* her (Ms. Ezell) that she (Renee) had *overheard* a Patriot employee supposedly utter a racial slur in a conversation about an "individual" in the "shipping department."  ROA.1646-48. Accused was Allen Bailey.  ROA.2037-63. Neither Allen Bailey nor another person mentioned by Robert, Gordon Satterwhite, had any supervisory status over Robert, who then reported only to Mickey. ROA.2065. Further Robert admitted not knowing what Mr. Bailey had said.  ROA.2061. He only reported the alleged statement of Mr. Bailey, never mentioned anything about Mr. Satterwhite to Ms. Becerra, the Human Resources ("HR") Manager.  ROA.2063-64.[1]

Despite the hearsay nature of the comment and despite the fact that it did not identify Robert by name (and that he had never heard the comment himself, ROA.2061,2066), Robert complained to Ms. Becerra. ROA.2037-63, 2065.  Ms. Becerra, in turn, advised Mickey. ROA.2037-63,

---

[1]    Only Mr. Bailey was listed in the Charge.  ROA.2065. ROA.2311.

2065.  Mickey understood from Ms. Becerra that Allen Bailey was the alleged wrongdoer. ROA.2037-63, 2065. Mickey immediately talked with Ms. Deselle, who confirmed that she (1) had not heard the racial comment, (2) affirmed that Mr. Bailey was not involved, and (3) denied that she had told Ms. Ezell about that purported event. ROA.2037-63, 2065.  With that understanding, neither Mickey nor the HR Manager went further, believing the story was baseless. ROA.2037-63, 2065.

## I.    What Mickey Concluded about the Fab Shop Overall and about Robert, and What Mickey Told Parley.

Mickey reviewed many issues and factors related to Patriot's Fab Shop, including process, personnel, purchasing, shipping, storage, inventory, quality assurance, safety, and cleanliness.  ROA.1714-15. He explained the importance of these factors.  ROA.1715-17.

Parley was aware that the Shop needed better processes, a topic he had mentioned to Robert; process was particularly important given the increased size of the company. ROA.1863. ROA.1867-68. So, when Trinity joined Patriot, Parley wanted Mickey to assess and make changes as needed in all these areas.  ROA.1846. As directed, Mickey made several modifications in all these areas, which he and Parley discussed. ROA.1718-19. ROA.1748-49.  ROA.1719-20 (they visited "every day";

ROA.1720). With a couple of exceptions, all of these areas were under Robert's control as Shop Manager.  ROA.1721.

Mickey was used to a much more process-driven fabrication environment, as he had managed for years at Trinity; Mickey said Trinity's success was due, in large part, to "adherence to process." ROA.1720. After Mickey came to Patriot, he implemented 30-40 new processes.  ROA.1720. ROA.1748. Mickey found that the Patriot Fab Shop was "quite the opposite," from what Mickey was used to at Trinity. ROA.1736.

Based on his Trinity experience, Mickey found at Patriot "cumulative" deficiencies in the shop under Robert's management ("several cases").  ROA.1652. ROA.1658.  By way of example, some projects under his supervision were found to have been cut improperly and had to be re-fabricated.  ROA.1658. ROA.1659.  ROA.1668. In addition, various production targets for the fabrication shop were not being met.  Product shipped to an erection site at times lacked the proper portions of the order, resulting in the fab shop scrambling to fill the missing pieces.  ROA.1660. ROA.1662. ROA.1663-64. ROA.1669-70. ROA.1741-42. Mickey judged Robert's management as "chaotic" because

Mickey found that the Shop was not well organized. ROA.1693. Mickey felt that he had to get in the middle of Shop management issues. ROA.1742. He did not trust Robert's management. ROA.1743. He had accuracy concerns about painting and sandblasting scheduling. ROA.1743-44. Additionally, inventory was not tracked properly (ROA.1658), and Mr. White would indiscriminately use parts or products from one job for another, as he deemed necessary to get a job done (thus, impacting other jobs). ROA.1660. Mickey observed these issues in the months after his arrival at Patriot in July 2019. ROA.1652-53.

Parley also was aware of these issues from his talks with Mickey and by seeing various emails. ROA.1847-48. Further, there were questions about the roll out of Patriot's new software ("Tekla"); Trinity long had used a similar program, and, based on his prior experience, Mickey concluded that Tekla was not being implemented correctly. ROA.1659. ROA.1676-78. As Shop Manager, Robert had responsibility for those tasks. ROA.1679.

Mickey was also concerned about Robert's lack of knowledge about an apparent duplication of fabrication efforts, when work was going to a sub-fabricator called "Kennedy." ROA.1652-58 He noted, "I expected he

would know what was going on in his shop." ROA.1656. ROA.1657.
Mickey concluded that Robert was not aware of all that was going on in
the Shop. ROA.1760. Likewise, Parley believed that Robert should have
known. ROA.1878.

In short, while Mickey was not brought in to fire Robert
(ROA.1717), Mickey had several concerns about him. ROA.1762-64.
Parley was also aware of the issues. ROA.1868-69.

By sending Robert various emails and talking with him daily,
Mickey sought to see if Robert would improve. ROA.1658-59. ROA.1646.
ROA.1652 (talked "every day to Robert"). ROA.1669. ROA.1676.
ROA.1721-22. ROA.1740-42. Parley was aware of this communication.
ROA.1847-48. Mickey sent detailed emails to Robert, on issues that
Mickey did not typically do at Trinity. ROA.1723. ROA.1724-28.
ROA.1744. ROA.1745-48.

In addition to the process issues, Mickey heard about morale issues;
Shop personnel privately complained to Mickey about Robert's aggressive
demeanor. ROA.1679. ROA.1685-86. Mickey believed that Robert, at
times, caused employees to be "job scared"—not a management style that
Mickey found conducive to a good work environment. ROA.1679-80.

ROA.1736-37. Parley had heard about these issues indirectly from other managers, such as Eric Herzog and Ted Turner, who were managing the Shop. ROA.1844. Mickey wanted to effect a change in culture at Patriot, which he did, and since then he has not had the same kind of morale complaints that existed before removing Robert from the Shop Manager position. ROA.1764. ROA.1697.

At the end, what Mickey concluded was that Robert was not the proper person to lead the Patriot fabrication shop into the future. ROA.1681-82. In mid-October 2019, Mickey relayed his concerns to Parley. ROA.1651. ROA.1681. Before Mickey came to Patriot, Parley also had tried to coach Robert. ROA.1844-45. Mickey also talked with the HR Manager, Ms. Becerra, who raised no concern about what Mickey wanted to do, or about the Patriot progressive discipline policy, and Ms. Becerra told him of no discrimination complaint from Robert. ROA.1672. ROA.1681. ROA.1730-31.

Mickey was not brought in to fire Robert, and he did not tell Parley to fire Robert, because he did not see his role in that way; he was not there to "manage him out of a job." ROA.1717. ROA.1662. ROA.1669. ROA.1748. Parley affirmed that he did not bring in Mickey to remove

Robert from the Shop Manager job. ROA.1852. Mickey's job was simply trying to improve the Shop overall. ROA.1748.

### J. Parley Is Concerned about Robert Personally, Talks with Robert, Offers Him Paid Leave to Sort Things Out, and Offers Him Three Possible Job Options.

Parley agreed with Mickey about moving Robert. ROA.1872. Parley delivered the news to Robert in a meeting during which job options were discussed. ROA.1651. ROA.1728-29. ROA.1853. ROA.2083-84. Parley would move Robert out of his Shop Manager job, but he was not terminating Robert's employment with Patriot. ROA.1891.

Parley valued Robert. ROA.1844-45. They were friends, and Parley cared about Robert. ROA.1873. He felt that Robert was, in a sense, a "kindred spirit" to Parley. ROA.1845. ROA.1883-85. Parley liked that Robert was a "striver." ROA.1845. Nevertheless, Parley was concerned about Robert because he was working "more hours than was reasonable." ROA.1854. Parley urged Robert to be patient and to take a couple of weeks off, before he determined "what opportunities [were] next." ROA.1859. ROA.1872.

On October 23, 2019, Mr. Dixon arranged a lengthy sit-down meeting with Robert. ROA.1854-55. ROA.1876. In this sympathetic

conversation, Parley expressed his heartfelt concerns for Robert on both a personal and professional level. ROA.1854-56. ROA.1876-77. Parley did not believe that Robert was in a good frame of mind, given his personal and work issues. ROA.1862.

Further, Parley wanted Robert to go on paid leave so that he might attend to his personal issues (such as his divorce and his children), as well as what job prospects he might consider after the leave was over. ROA.1854-55. ROA.1865. Parley was not firing Robert; Parley envisioned Robert returning to a Patriot job, and he told Robert that "regardless of the position that he is going to be on a paid leave situation." ROA.1855. Parley did not want Robert to leave Patriot. ROA.1861-62.

Aside from expressing concern for Robert, wanting him to get well, offering 6-8 weeks of paid leave with benefits,[2] which Robert appreciated and found "useful," Parley discussed three options for work. ROA.1859-60. ROA.1885. ROA.1909. ROA.2073. The options included a "move within the company, same salary range, or a possible job through an affiliated private equity company. ROA.1860. ROA.1874-75. ROA.1906.

---

[2] Paid leave is not within the stated Company policies. ROA.1882-83. Parley made this exception for Robert. ROA.1883. ROA.2073-74.

ROA.2083-84. Parley talked with Robert about a possible job with Patriot's sales' or estimating group. ROA.1862. ROA.2083-84. Parley talked about a job "managing field activities." ROA.1874. Parley wanted to "match Robert's talents with the Company needs." ROA.1875. His pay and benefits would remain the same. ROA.1875. Parley hoped that Robert would choose to stay at Patriot. ROA.1877. Parley did not want to let Robert go because Patriot's employees are critical to its business. ROA.1904-05. A third option discussed was the possibility of Robert having his own business. ROA.1860. ROA.1874-75. ROA.2084. If that was his choice, Parley said that Patriot would try to support him as best it could. ROA.1876. Robert has agreed that these possibilities were presented. ROA.2073.

Nevertheless, during the meeting, Robert said that he did not want to continue at Patriot, if he could not continue as Shop Manager. ROA.1877.

### K. The Management Change with Robert Was One of Many Within Patriot, as to Processes and Personnel; Robert Was Not Alone—Several Others Also Were Moved during the Reorganization.

That Patriot sought to move White out of the Shop Manager position was merely one of numerous changes that were ongoing.

ROA.1710. New software was being rolled out, new personnel came on board, and existing personnel were moved, just like Mr. White. ROA.1710. Patriot was trying to put the right people in the right positions, including as to Mickey.  ROA.1710. ROA.1750.  Parley referred to it as getting the right people on the bus in the right seats.  ROA.1890-91. Other people moved were Eric Herzog (white male), Ted Turner (white male), a white female employee named "Shelly" in purchasing, and a white male, "Ben," in shipping.  ROA.1711-12. At the same time, Robert also played a role in changing personnel in the Shop; he terminated a Hispanic shipping employee.  ROA.1750-51. As to the moving of these other persons, and specifically, Shelly and Ben, Mickey did not review their personnel files, much like he did not review Robert's file. ROA.1737. ROA.1756. Parley noted that the company changed CFOs twice, and the Company had a number of field and craft changes. ROA.1892. As done with Robert, other Patriot people, like Eric Herzog, were moved to match talents and abilities with the Company as it was being reorganized. ROA.1893.

> **L. Texts and Emails Demonstrate that Patriot Hoped Robert Would Stay, and Robert Talked about the Prospect of a Possible Sales Job at Patriot.**

After his talk with Parley, Robert exchanged communications with Parley, Ted Turner (another manager at that time) and others. Like Parley, Mr. Turner urged Robert not to be hasty, that Robert should consider the options that Parley had laid out for Robert. ROA.2092-93. ROA.2327-25. Both Parley and Mr. Turner made overtures to Robert so that he would stay. ROA.1898. ROA.2327-25. In a text, Mr. Turner stated: "All of us truly hope you decide to continue the relationship with us through one of the options Parley outlined." ROA.1898. ROA.2318. ROA.2094. Critically, on October 24, 2023, Robert said in a text to Parley, "I'm obviously not using them . . . unless I'll need them in sales." ROA.1899. ROA.2323. Robert was hoping and considering a "possible sales job." ROA.2095. Parley said to keep the Patriot property, essentially acknowledging that Robert might come to work in sales, a position he had talked with Robert about. ROA.1899. That was Parley's hope. ROA.1899. ROA.2095-96.

**M.    Robert Goes in a Different Direction.**

Parley did not talk with Robert further about the first two options (another job at Patriot or at an affiliated company), because of a text he received 4-5 days later, stating that he was going to start his own

business. ROA.1860-61. This was in line with that Robert declared at the meeting with Parley. ROA.1877

On October 31, 2019, about a week after Parley talked with Robert, Robert founded Phynix Fabrication Corp., filing a Texas certificate of formation. ROA.1729. ROA.1896. ROA.2097. ROA.2456. From that point forward, all communication that Robert had with Patriot was about solidifying these plans, getting advice from Patriot's executives about how to get the business off the ground. ROA.1896. ROA.2101. ROA.2100-04. *See, e.g.,* ROA.2419, 2420, 2442-48. He did not complain about discrimination or retaliation or anything else. ROA.2100-04. He did not have much more communication with Parley. ROA.2099. Robert never said to Parley that he wanted a job at Patriot. ROA.1897. While Robert claims that Parley said that there was no job, in none of these text communications did Robert ever once complain about that purported cancellation of a job by Parley nor did he demand the job that Parley had talked about in the late October meeting. ROA.2105-07.

During the time, all that Robert talked with Patriot personnel was about starting his own business, while he was getting paid by the Company. ROA.2108-10.

Robert voluntarily chose to open his own business, because he thought it would likely prove to be a "better" option. ROA.2121-22. He wanted to be president of Phynix. ROA.2107. Running his own fabrication shop was within his "wheelhouse." ROA.2121-22.

### N. Justin Snyder, Biracial Like Robert, Became the Shop Manager.

When Robert went on paid leave, Patriot put in a temporary replacement, Justin Snyder, who eventually was named the permanent Shop Manager.  White is biracial, as a person with a white and black background.  The replacement for his position was Justin Snyder, who is also biracial, as he is a person with a white and Hispanic background. ROA.1811.

### O. Robert's Intentions Were Clear from the Very Start; He Quickly Formed His Company Phynix, and Then with Patriot Representatives Only Talked about Its Start and How to Best Get It Going as a Business.

During his corporate start-up process, Robert sought and received considerable business advice from Patriot representatives (or its private equity members); he asked, for example, about the appropriate business entity and which accounting software to use, *see, e.g.*, ROA.2419, 2420, 2442-48 (various emails and texts with and from Mr. White after he had

talked with Parley). ROA.1900-04. In none of the messages between Robert and Patriot representatives, did Robert ever ask for a Patriot job. ROA.1904

At no time, during the weeks of 2019 while he was on paid leave, did Robert ever claim he was discriminated against or that the Company had retaliated against him or that he was forced out of Patriot. ROA.1897. All he did was receive free advice and guidance from Patriot, while the Company paid him. ROA.1900-04.

## P. Patriot's Progressive Discipline Policy and Its Inapplicability to Robert.

Not surprisingly, Patriot's policy concerns possible job termination—the "three strikes and you are out" rule (ROA.1852):

> **7.20   PROGRESSIVE DISCIPLINE**
>
> The purpose of this policy is to state the company's position on administering equitable and consistent discipline for unsatisfactory conduct in the workplace. The best disciplinary measure is one that does not have to be enforced and comes from good leadership and fair supervision at all employment levels.
>
> The company's best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform, and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future.
>
> **Although employment with Patriot Erectors, Inc. is based on mutual consent and both the employee and the company have the right to terminate employment at will, with or without cause or advance notice, Patriot Erectors, Inc. may use progressive discipline at its discretion.**
>
> Disciplinary action may call for any of four steps -- verbal warning, written warning, suspension without pay, or termination of employment -- depending on the severity, circumstances of the problem and/or the number of occurrences. There may be factors causing one or more steps to be bypassed.

The policy not only underscores that employment is at-will, but notes specifically that the Company has leeway in following the rule in a given circumstance. ROA.1672-73. When Mickey talked with Parley about moving Robert from the Shop Manager position, Mickey also talked with the HR Manager, Ms. Becerra, and she raised no concern about the application of this policy. ROA.1672. Parley expected that Mickey had discussed various issues with Robert, as emails reflected. ROA.1848. The policy says nothing about reorganizations or internal transfers of personnel.

Robert might have been fired for insubordination, but he was not. ROA.1885-86. Robert might have been fired for his mistreatment of employees, but he was not. ROA.2072. As of 2019, Robert had two formal write-ups in his file and had he been given another, he could have been terminated. ROA.2038-39. But, this policy was not used for that purpose with Robert, because it concerns termination procedures, which did not apply to Robert and the reorganization process at Patriot.

The Company did not consider its actions with Robert as coming under the policy because they were not following a disciplinary plan with him. ROA.1889. Parley saw his efforts with Robert as an effort to support

him. ROA.1889.

More importantly, there is no evidence whatsoever that anyone else moved in the reorganization was treated differently—whether Mickey Swor, Ted Turner, Eric Herzog, Shelly, Ben or anyone else.

### Q.    Patriot Sends Work to Phynix.

Patriot sent Robert (Phynix) several jobs after he left Patriot. ROA.1731-32. Aside from Phynix getting about $55,000 in jobs from Patriot, Mickey also tried to help Robert get paid quicker.  ROA.1732-33. ROA.1924. Patriot also shared process documents and some equipment (at no cost to Robert/Phynix). ROA.1733-34. ROA.1922-24. Throughout this time, Mickey never received any complaint from Robert suggesting he had been discriminated against.  ROA.1734.

### R. Robert Never Complained about Discrimination or Retaliation, or that the Company Failed to Follow Its Policies as to Him.

It is noteworthy (1) that Robert well knew about the progressive discipline policy, as he invoked it often (*see, e.g.*, ROA.1796-97. ROA.2079); (2) that he knew to bring a complaint about a racial slur to the HR Manager; and (3) when he was concerned or disturbed by an issue at work he knew exactly how to write memos with his grievances.

ROA.1909-11. ROA.2040-47. ROA.2414-15. Specifically, in his memo after Parley talked with him, Robert made no complaint about discrimination or retaliation, but he said he was "grateful" to the Company. ROA.1911-12. ROA.2047-53. ROA.2087-88. ROA.2411-12.

Further emails after he left were about Phynix business, and none contained complaints about discrimination. ROA.1913-16.His TWC complaint contained no such complaints. ROA.1917-18. Without question, Robert had the email and/or text numbers for many people in Patriot management, including Parley, Mickey, Ted Turner, Eric Herzog, the HR Manager, and others. ROA.2034-38. Yet, Robert never complained to anyone at any time that he had been discriminated or retaliated against. ROA.2034-38.

In fact, in looking at the email that he sent on October 24, 2019, Robert admitted that he "loved" the employee "Junior" and loved Parley. ROA.2075-76. He never heard a racial slur from Parley, had a good relationship with him; Robert denies that Parley discriminated against him. ROA.2076-77. He agreed that there was no discrimination by Mr. Herzog, or Mr. Turner, no discrimination in his hiring, promoting him,

or paying him. ROA.2078. Robert never accused Parley of discrimination or complained about Mickey. ROA.2097.

Robert admits that he had "no inkling" about discrimination. ROA.2111. He "did not know." ROA.2111. In his emails with Patriot, after he started Patriot, he never said that he was discriminated against to either Parley or Mickey. ROA.2112-13.

### S.    COVID and Its Unfortunate Effect on Both Patriot and Phynix.

The problem was that neither Patriot nor Robert knew that the American economy would buckle under the COVID pandemic.

With the COVID pandemic, the general business environment, particularly for a new start-up, was not conducive to growth. ROA.1929-30. Phynix had a lot of problems due to work slow-down and employees who refused to come to his site. ROA.2113-14. And, yet, he raised no complaint of discrimination against anyone at Patriot, including Parley and Mickey. ROA.2114. ROA.2115-16. As Phynix struggled, Mr. White started a new roofing business, which was successful; it had $1.8 million in sales. ROA.2114-15.

Moreover, as work slowed, whatever excess capacity that Patriot had was absorbed by the newly acquired Trinity facility, making any

excess capacity for outside fabricators less likely and, in fact, "overflow" work dried up to virtually nothing.  While the hit to a start-up was more difficult, Patriot was stung by COVID, too; Patriot had to retrench, its sub-fabrication jobs dried up, it had reductions in force, and it was looking to see how Trinity and Patriot could survive.  Patriot went from about 120-130 people in the Fab Shop to 40.  ROA.1864-65.

### T. The TWC Claim Was Also Silent about Discrimination and Retaliation.

In March 2020, Mr. White filed an unemployment claim (ROA.2392), stating that he was "permanently laid off," but he did not mention any race discrimination, retaliation, or constructive discharge (just like he never raised any complaints with Patriot before then, ROA.1730).  Though well-versed in the "progressive discipline" policy. *See, e.g.*, ROA.1796-97.  ROA.2079.  In his TWC filing, Robert never suggested that the Company had run afoul of this rule.  Or that his treatment under it was discriminatory.  ROA.2392.

### U.  Discrimination Lawsuit Filed Only after Phynix Was Not Successful.

What is certain is that Robert first alleged discrimination only in his EEOC Charge, or ten months after he had started Phynix, after it

was not the success that he had hoped for. While that may be dashed hopes of business success, it is not discrimination by Patriot.

## STANDARD OF REVIEW

### I. Standard of review for a directed verdict.

A motion for directed verdict is subject to a *de novo* review, applying the same standard as the district court. *See Arthur J. Gallagher & Co. v. Babcock,* 703 F.3d 284, 292-93 (5th Cir.2012). "If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), overruled on other grounds by *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir.1997) (en banc) (cleaned up). The facts are viewed, and inferences made, in the light most favorable to the nonmovant. *Babcock,* 703 F.3d at 293. "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000). Thus, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted

and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (citations omitted).

## A.    Standard of review for a jury verdict.

Regarding a jury verdict, this court views the evidence in the light most favorable to the prevailing party. *See King v. Armstrong World Industries, Inc.,* 906 F.2d 1022, 1027 (5th Cir. 1990). Yet, a reasonable evidentiary basis for the jury's verdict must exist. *See Loehr v. Offshore Logistics, Inc.,* 691 F.2d 758, 760 (5th Cir. 1982). Further, the jury verdict must be set aside when probative facts are missing to support the conclusion. *See Huffman v. Union Pac. R.R.,* 675 F.3d 412, 425 (5th Cir. 2012) (citation omitted).

## SUMMARY OF THE ARGUMENT

At core, this is not a case of discrimination. It is a case of a company trying to find a solution for Robert White at a difficult time in his life. While Patriot decided he would no longer lead the Shop, it offered him other alternatives, other possible work options. All of this occurred, while the Company was going through a reorganization, during which Patriot was assimilating a new acquired company called Trinity Steel ("Trinity"), bringing in new processes and personnel, and moving its team members,

not just Robert, to jobs that fit their talents. This change occurred also at a time of personal turmoil for Robert, and Parley, Robert's friend, offered him personal paid leave to get his personal life in order and to choose how he wanted to proceed in work. Rather than move to a different Patriot position, such as in sales, Mr. White chose to leave Patriot to start his own business, Phynix Fabrication ("Phynix"). He seemed intent on this from the very start, as Phynix was formed within about a week after Parley talked with Robert. Even then, Patriot management cared about him and tried its best to help him get Phynix off the ground. That he did not, during COVID, is not Patriot's fault or evidence of discrimination at all.

## ARGUMENTS AND AUTHORITIES

## I.    The Same Standards Apply for Title VII and §1981 Claims.

White asserted claims under Title VII and 42 U.S.C. § 1981 based upon the very same factual accusations. ROA.10-15. The same analysis is used for both claims. *See Owens v. Circassia Pharma., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022) (hereinafter "*Owens*"); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 901 (E.D. Tex. 2004)("Claims of discrimination brought under Title VII and § 1981 require the same proof to establish

liability."). Accordingly, when, as here, a plaintiff's Title VII claim fails, the plaintiff's §1981 claim also does not succeed. *See Lockett*, 337 F. Supp. 2d at 901.

## II. The *McDonnell Douglas* Framework Applies

Without direct evidence[3] of discrimination, which Mr. White has not presented, the Court analyzes White's claims under the *McDonnell Douglas Corp. v. Green* burden shifting analysis. *See Owens,* 33 F. 4th at 825. That legal framework requires that a plaintiff must first establish a *prima facie* race discrimination case. *See id.; Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). "

"If the plaintiff succeeds in showing a *prima facie* case, the defendant must then provide some legitimate, non-discriminatory reason for the employee's rejection." 209 F.3d at 425. As *Owens* further states, "Then the burden shifts back to [the Plaintiff], who must counter with substantial evidence the [the employer's] proffered reason is pretextual." 33 F. 4th at 825. Thus, the burden to put forward substantial pretext evidence is on Mr. White. *See Cherry v. Premier Prints, Inc.,* Civ. Action

---

    [3]    "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

No. 1:21-CV-59-SA-DAS, 2022 WL 3636606, at *9 (N.D. Miss. Aug. 23, 2022) ("mere disagreement" is insufficient) (hereinafter "*Cherry*").

## III.  Mr. White Did Not Establish a *Prima Facie* Case of Race Discrimination.

For Plaintiff, he must show (1) that he is a member of a protected group; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that he was replaced by someone outside of his protected group.  *Owens*, 33 F. 4th at 825.  The trial evidence demonstrated, as a matter of law, that White was not discharged, he quit to run Phynix, and that he was not replaced by someone outside of his protected group.

### A.    No Replacement by a Person Outside of the Mr. White's Protected Class.

While Patriot also disputes that there was sufficient evidence of the third prong, see below, there is also insufficient evidence that the fourth prong was met.  Both White and Snyder are biracial.  Thus, the fourth prong of the *McDonnell Douglas* standard fails as a matter of law.  *See Wright v. United Parcel Serv., Inc.*, 842 Fed. Appx. 869, 872-73 (5th Cir. 2021); *Jeffries v. Barr*, 965 F.3d 843, 863 (D.C. Cir. 2020) (biracial selection arguably in the "'same protected class'") (citation omitted).

**B.    Mr. White Quit and Was Not Terminated.**

In addition, concerning the third prong, there is insufficient evidence that Patriot terminated White; instead, he choose to leave Patriot, start his own business, despite Patriot's desire and efforts for him to stay.    Thus, White failed to prove a *prima facie* case of discrimination also as to the third prong of *McDonnell Douglas*.    *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342-43 (5th 2005); *see also Quinn v. St. Louis Cnty*, 653 Fed. 745, (8th Cir. 2011) (no evidence forced to quit); *Ross v. Perry, Ga.*, 395 Fed. Appx. 668, 670 (11th Cir. 2010) (employee given choice of resigning or being terminated); *Adams v. Lucent Techs., Inc.*, 284 Fed. Appx. 296, 301-02 (6th Cir. 2008) (no evidence told losing their jobs).

White has argued that his situation was one of termination, but that termination only came about because he chose the option of leaving the Company. He admits being provided three possible options at his meeting with Parley, one of which was continued employment at Patriot at the same pay and benefits. ROA.2073. ROA.1651. ROA.1728-29. ROA.1853. ROA.2083-84. Rather than remain at Patriot in another role, which could have been in sales, as his text messages to Parley state

(ROA.1899. ROA.2323. ROA.2095), instead, he quickly opted to start his own fabrication business, Phynix, started a week after he talked with Parley.   ROA.1729. ROA.1896. ROA.2097. ROA.2456.   And he did so, even though his friend Parley (and others) cautioned him not to be "hasty." ROA.1877. ROA.2084. This was his choice, but it was not Patriot taking an adverse employment action against him.

## IV.   Mr. White Did Not Sustain His Burden to Prove that Patriot Discriminated against Him.

The burden to prove discrimination at all times rested with Plaintiff.  *See Mueck v. La Grange Acquisitions, L.P.,* 75 F.4th 469, 483-84 (5th Cir. 2023); *Black v. Mississippi Dept. of Rehab. Servs.,* No. 2260409, 2023 WL 4341459, at *2 (5th Cir. July 5, 2023) (per curiam); *Cromwell v. Boa Vida Hosp. of Aberdeen, MS, L.L.C.*, No. 22-60109, 2023 WL 2535739, at *2 (5th Cir. March 16, 2023); *see also Baker v. American Air., Inc.,* 430 F.3d 750, 754 (5th Cir. 2005) (burden as to pretext remained with plaintiff) (hereafter "*Baker*").   The trouble is that his case is devoid of evidence of discriminatory intent or actions.

### A.   No Evidence of Discrimination.

Mr. White's testimony is clear:  This case is not about any alleged discriminatory statements or actions made by Parley or Mickey; he had

none to complain about and had no knowledge of being discriminated against. *See, e.g.*, ROA.2034-38. ROA.2075-77. ROA.2095.

This case is not about comparators treated differently. At the time of this Company reshuffling and reorganization, many different people were moved to different positions (and some were terminated). White, who had the burden of proof, never offered evidence that he was treated any differently than the others moved about by Patriot, none of whom were not in his protected class. *See, e.g.*, ROA.1711-12. Thus, this is not a case of disparate treatment. *See Edwin v. Clean Harbors Environmental Servs. Inc.*, No. 22-30263, 2023 WL 4046275, at *3 (5th Cir. June 16, 2023) (per curiam) (Plaintiff "must establish that he was treated less favorably than a similarly situated employee outside of his protected class in nearly identical circumstances)(citation omitted); *Forbis v. Exeter Fin., L.L.C.*, No. 22-10193, 2022 WL 17986689, at *4 (5th Cir. Dec. 29, 2022) (per curiam)  (hereinafter "*Forbis*") (citing *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 827 (5th  Cir. 2022) (quoting *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 515 (5th Cir. 2001)).

And this case is not about retaliation, as the jury found. The jury's decision implicitly underscores that Mickey harbored no ill will to Robert,

despite the racial slur complaint he had raised about hearsay concerning another manager (about a month before Robert was put on leave and removed from the Shop manager position). *See Lyons v. Katy Ind. Sch. Dist.*, 964 F.3d 298, 306-07 (5th Cir. 2020) (close "temporal proximity insufficient to prove pretext"); *Baker v. American Air., Inc.,* 430 F.3d at 755 (allegation of manager being "contentious" insufficient as a matter of law). In fact, Mickey took immediate action to see if the allegation was correct, which he ascertained was not accurate. Importantly, this alleged statement was not made by Mickey, but was reported to White third-hand by another. *See, e.g.,* ROA.2037-63, 2065. As Patriot (Mickey/Parley) were found not to have retaliated against Robert, these circumstances cannot be used to meet Plaintiff's burden on the discrimination allegation. *See id.*

### B.    Plaintiff's Much Later Developed Opinion about Discrimination Is Insufficient as a Matter Of Law.

At core, this is a case about the Plaintiff's subjective belief that Patriot's decision was wrong. A conclusion he couched in terms of discrimination and that assumption arose many months after he left Patriot, after his business had failed (and he blamed Patriot), and which came after he had never raised a single complaint about discrimination

or retaliation. In fact, Robert admitted that he had no idea that discrimination was involved. That Plaintiff pleaded "ignorance" is belied by the fact that Robert well knew the Company rules, enforced progressive discipline with all his employees, and knew how to raise complaints if he felt they were warranted (ROA.2411-12. ROA.2414-15), including a complaint about a racial slur. Robert knew the rules, he knew to whom and how to communicate and he never asserted that his departure from Patriot was discriminatory, until after Phynix struggled during COVID. *See, e.g.,* ROA.2114. ROA.2115-16.

Robert admitted that a disagreement is not necessarily discrimination. ROA.2079. He admitted that his supervisors' disagreement about his performance was not discrimination. ROA.2085-86. A belief that the employer's decision was "wrong" is not sufficient discrimination proof. See *Culley v. West Bolivar Consol. Sch. Dist.*, No. 4:20-CV-190, 2023 WL 5007871, at *5-6 (N.D. Miss. Aug. 4, 2023) (employers may be "unreasonable . . . as long as "they do not act with discriminatory animus") (quoting *Owens*, 33 F.4th at 826) (hereafter "*Culley*"). "Mere disputes" or a "mere disagreements" about performance are not evidence of discrimination. *See Forbis*, 2022 WL 17986689, at *5

("stringent pretext stage" requires more than just a "dispute" and argument that a decision was "wrong") (citing and quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)).  *Owens,* 33 F.4th at 831 ("Mere disputes" insufficient) (citation omitted); *Cherry,* 2022 WL 3636606, at *9 ("mere disagreement" insufficient).

The circumstance of Robert's later developed theory amounts to nothing but his mere belief, and that, no matter how strongly held, that race played a part in the decision is insufficient as a matter of law.  As has been stated by one court and often repeated by many, "An employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief." *Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 817-18 (S.D. Tex. 1998).  The Fifth Circuit has consistently been "very cautious about self-serving and conclusory testimony based on a subjective belief that…discrimination occurred." *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152 (5th Cir. 1995). These circumstance do not demonstrate discrimination.

## V.    This Is A Case of Company Reorganization, Not a Termination Targeted against Mr. White Due to His Race; He Instead Chose to Leave Patriot and Start His Own Business.

This case is unique because it is about changes at Patriot

throughout its organization to improve its processes, make it more efficient, and provide ways for growth, to take it to the next level. ROA.1710. Many people were moved to different positions. The only difference here is that Robert was given paid leave on a humanitarian basis, while he decided what he wanted to do. Despite the job options discussed, Robert decided, on his own, to go in a different direction, because he believed it would be the most lucrative. ROA.2121-22. That was his choice. Within a week of talking to Parley, Robert opened a business as a subcontractor fabricator, to whom Patriot might send work.

From then on all of his communications with Patriot were about starting and running Phynix, all while the Company paid him to the end of the year. *See. e.g.,* ROA.2101. ROA.2100-04. All at Patriot were trying to help him get his business going *because that was his stated goal, to the exclusion of other options.* For his part, Robert accepted all this free advice and financial help without complaint. *See. e.g.,* ROA.2100-04.

In sum, Mr. White voluntarily resigned to seek his fortune elsewhere. He saw Phynix as his best option.

## VI.    Patriot's Legitimate Business Decision Cannot be Second-Guessed; Patriot Had Every Right to Rely on Trinity's Fabrication Experience and on Mickey Swor and His Expertise.

Without question, Patriot had every right to move personnel, bring in new programs, and adopt a multitude of processes that had not existed before. Without question, Patriot had a right to rely on Trinity's fabrication expertise which Mickey brought to Patriot—that is why he was there. *See. e.g.,* ROA.1845. ROA.1894-96. The courts may not act as "super personnel departments," to "second-guess" those choices. *See Eyob v. Mitsubishi Caterpillar Forklift America, Inc.*, 745 Fed. Appx. 209, 211-12 (5th Cir. 2019) (citations omitted); *Nygren v. Dollar Tree, Inc.*, Civ. Action No. 20-2714, 2021 WL 3741526, at *12 (E.D. La. Aug. 24, 2021).

If Patriot chose to use Trinity as the gold standard for taking Patriot to the next level of fabrication, if Patriot chose to use Mickey to assess and provide his expert assessment, that was Patriot's choice.  It goes without saying, no court should act as a "super HR department," with the goal of rejiggering Patriot's decisions, even if disagreed with today.   That conclusion applies even if one might believe that the "subjective" conclusions of Mickey were incorrect. *See Pennucci-Anderson v. Ochsner Health Sys.*, 2021 WL 242862, at *3, 5 (E.D. La. Jan. 25, 2021)

(issue is not whether employer was "correct or fair," but whether the reason was "honestly believed"; *id.* at *5) (footnote omitted) (hereafter "*Pennucci*").

Thus, there is no question that Patriot had a legitimate, non-discriminatory reason for the decision it made in moving White out of the Shop, and that decision cannot be questioned after the fact, even if others disagree.

These actions are patently not evidence of discrimination but of a Company trying its best to reorganize and, at the same time, to help a long term employee for whom people cared for get through a difficult time period. At most, what this demonstrates is that "no good deed goes unpunished."

## VII. Patriot's "Progressive Discipline" Policy Is Inapplicable; Mr. White Was Not Being Managed out of a Job, and There Is No Evidence of Discriminatory Application, in Any Case.

If Patriot had a right to make the changes that it did to improve its operations overall, if White can show no difference in treatment between him and anyone else, and if this case is not about the standard evidence one might find in a discrimination case, *then what is it about*?

This case boils down to one argument: That Mickey supposedly did not follow Company policy in "writing up" Robert. Like the other matters noted above, this argument fails. Here, (1) Plaintiff has made no showing that this policy applies to what Patriot was doing at that time, which was essentially a reorganization of its operations overall; (2) Robert was not terminated when Parley talked with him.

First, Plaintiff never proved the Patriot's progressive discipline policy applied here to him. Both Parley and Mickey were clear: This was not an attempt to manage White out of Patriot. ROA.1660. The only thing going on was that Patriot chose to make a change in management in the Shop, just as Patriot did with many others during this time. What Mickey was charged with doing was being the outside expert to figure out what was best for the Fab Shop's operations. No one ever said that White was being fired, and specifically Parley never said that to Robert when they met. ROA.2084-85. Simply he was offered other employment at Patriot, which he acknowledged in a text. ROA.2423. ROA.2417-25.

Furthermore, Plaintiff has not shown how he was treated differently than any other person who was shuffled around in Patriot reorganizations, such as Mickey, Herzog, Turner, Shelley, Ben or anyone

else (ROA.1642), all of whom are not in Robert's protected class and were moved into different roles within Patriot during 2019. Plaintiff has not met his burden to show that he was treated any differently as to this policy. In essence, no one was subjected to progressive discipline, because all, just like Robert, were not being managed out of the Company. They were given other roles that Patriot felt better suited their skills, just as Parley offered to Robert.

Without Plaintiff showing a discriminatory application of the rules as to him, this argument is unavailing as evidence of discrimination. *See Eyob v. Mitsubishi Caterpillar Forklift America, Inc.*, 745 Fed. Appx. 209, 211-12 (5th Cir. 2019) (". . . Eyob offers no evidence and makes no arguments that MCFA's progressive discipline policy was exercised for the other plant supervisors, but bypassed only in his case." 2017 WL 3215171, at *7"); *Turner v. Baylor Richardson Med. Cntr.*, 476 F.3d 337, 346 (5th Cir. 2007) ("Turner has introduced no evidence suggesting that RHA adhered to its disciplinary policies differently in cases involving non-minority employees."); *Sun v. Tetra Techs., Inc.*, No. 22-20646, 2023 WL 6892227, at *2 (5th Cir. Oct. 19, 2023) (per curiam) (no evidence that company's "deviation was along racial lines"; "failure to follow its own

policy is not probative of discriminatory animus in absence of proof that plaintiff was treated differently than other non-minority employees") (footnote omitted).

Finally, the policy contained language providing Patriot with leeway to follow the policy or not. ROA.1852. Thus, the policy, whether applicable or not or followed or not is not relevant evidence of pretext. *See Esparza v. Advanced Network Man., Inc.,* No. EP-21-CV-199-KC, 2023 WL 5419810, at *6 (W.D. Tex. Aug. 22, 2023); *(*a failure to follow a policy "does not create an inference of pretext" when employer has discretion under the policy) (citing *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 391 (5th Cir. 2020); *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 Fed. Appx. 209, 212–13 (5th Cir. 2018) (collecting cases)).

## VIII. White's Resignation Is Not Actionable; No Constructive Discharge.

Furthermore, an employee's resignation may be actionable only if the resignation qualifies as a constructive discharge. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Here, Robert never pled or argued constructive discharge; he has never argued that his working conditions were "so intolerable that a reasonable employee would feel

compelled to resign." *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997). Thus, his resignation from Patriot provides no basis for this claim.

## IX.    Even if Mr. White Was "Discharged," Patriot Had a Legitimate Business Reason for Doing So.

Even if one considered his employment situation as an involuntary termination, Patriot had legitimate, non-discriminatory reasons for doing so. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Robert's claims fail in light of the fact that Patriot can "articulate a legitimate, nondiscriminatory reason for its actions." *Id.*

As stated above, in late October 2019, Parley arranged a sit-down meeting with Mr. White based on Mr. White's reported performance as the manager/supervisor of the fabrication shop, as well as Parley's human and friend concern for him personally. *See. e.g.,* ROA.1854-56. ROA.1876-77. Mr. White was experiencing, what appeared to be, considerable stress due to his divorce and due to the conflict of having an on-going "secret" affair with Ms. Ezell. This combined situation led to Parley talking with Mr. White, and the performance concerns directly led to Robert being moved from the shop's leadership, though other jobs were possible, as White had to admit. Thus, the instigating reason for Parley's meeting Mr. White was not discrimination, but to move Robert to a

possible different position and Parley's genuine concern for Mr. White as a person. *See. e.g.,* ROA.1854-56. ROA.1876-77.

## X.     Mr. White Has No Substantial Evidence of Pretext.

In the face of Patriot's legitimate business reasons for the steps it took, Plaintiff had the burden to present "substantial evidence of pretext," that is, that the reason for Patriot's actions were false. *Owens,* 33 F. 4th at 825. *See also Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004) (Plaintiff "must present evidence that the employer's proffered reason was mere pretext for racial discrimination."). This was Plaintiff's burden. *See Baker,* 430 F.3d at 754.

Critically, the pretext inquiry looks at whether the Company's conclusion was "honestly believed." See *Harville v. City of Houston*, 945 F.3d 870, 877 (5th Cir. 2019) ("The issue at the pretext stage is not whether the [defendants'] reason was actually correct or fair, but whether the decision-makers honestly believed the reason."). *See also Pennucci*, 2021 WL 242862, at * 5. Pretext evidence, in sum, must show that the reason is a "cover-up" or a "lie" about the employer's true motive. *See Godfrey v. Katy Indep. Sch. Dist.*, 395 Fed. Appx. 88, 91 (5th Cir. 2010) ("a coverup") (citation omitted). *See also Wallace v. Methodist Hosp. Sys.*,

271 F.3d 212, 220 (5th Cir. 2001) ("unworthy of credence"); *see also*

*Barnes v. Bd. of Tr. of Univ. of Ill.*, 946 F.3d 384, 389-90 (7th Cir. 2020)

(describing pretext as not "just faulty reasoning or mistaken judgment

on the part of the employer; it is [a] 'lie, specifically a phony reason for

some action.' "). This is where Plaintiff's case falls short.  Here, there is

no evidence of pretext, substantial or otherwise.

"Evidence is substantial if it is of such quality and weight that

reasonable and fair-minded [triers of fact] in the exercise of impartial

judgment might reach different conclusions." *Owens*, 33 F.4th at 826.

(quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (internal

quotation marks omitted)).  In fact, the evidence of "falsity must be of

sufficient nature, extent and quality to make the inferential leap to

discrimination a rational one." *Owens*, 33 F.4th at 826 n.7 (quotations

and citation omitted).  Moreover, "weak" evidence of pretext is

insufficient because the courts require an "inferential leap" to find

pretext and thus discrimination. *See January v. Huntsville*, 74 F.4th 646,

655 (5th Cir. 2023).

Without evidence beyond a mere scintilla that the "true reason" for

the employer's action was discriminatory animus, the claim fails.  *Id.*

(citation omitted). This Court in *Owens* stated that any evidence of so-called falsity, must "be colored with shades of pretext," or the claim cannot proceed. *Id.* (citing *Owens,* 33 F. 4th at 834-35).

Within any proffered evidence of pretext, which must be substantial as a beginning point, the question is has the Plaintiff demonstrated to a "reasonable factfinder [so that he/she] could infer discrimination." *Owens* 33 F. 4th at 826.

It is notable that this Court has dismissed a Plaintiff's long list of purported pretext evidence such as:

> 1) remarks by one of her supervisors, Arthur Mack; (2) ignoring Sun's report to Mack's supervisor Judy Guy-Caffey about Mack's discriminatory animus; (3) Mack and Guy-Caffey's interference in Sun's publication; (4) her merit-based raises; (5) her replacement by white employees at the company; and (6) the company's failure to follow its procedures of placing employees on a Performance Improvement Plan ("PIP") to remediate issues.

*Sun,* 2023 WL 689227, at *2. While some evidence of pretext was found in some racially charged comments, the Court also agreed that "none of [Plaintiff's] other arguments regarding pretext are convincing." *Id.* *See also Cherry,* 2022 WL 3636606, at *9 (comments about homosexuals).

The point is that Plaintiff must show that the business rationale of the employer was false, and the Fifth Circuit, as noted in *Sun*, does not

lightly assume pretext. Nevertheless, merely a dispute about the reason is insufficient as a matter of law. *Pennucci*, 2021 WL 242862, at *4.

### A. No Racially Charged Statements by the Decision-Makers.

Neither Parley nor Mickey are accused of racially charged statements. *Compare Sun*, 2023 WL 689227, at *2 (pretext found solely on curse about "f-ing slow Chinese and references to employee's communication skills being low; "none" of the issues raised deemed "convincing").

### B. No Evidence of Treating Comparator Differently.

Also not present is any theoretically different treatment of comparators. At the time of this Company reshuffling and reorganization, many different people (of all races and both sexes) were moved to different positions (and some were terminated). So, there were no bad actions by Patriot of unique bad treatment targeting of Robert. *Owens* 33 F. 4th at 826-27 (evidence of disparate treatment might suggest pretext; not presented in the evidence). *See also Culley,* 2023 WL 5007871, at *5-6 (treatment of men better than of women). To the opposite, here Mr. White was given preferential treatment over others.

### C. No Evidence of "Sabotage."

Further, this case is not about Mickey sabotaging White. What evidence would ever show that his purpose was other than providing his expert advice to Patriot, as it asked him to do? *Cf. Culley*, <u>2023 WL 5007871</u>, at \*5 (evidence of employer sabotaging or interfering with employee).

### D. No Retaliation.

This case is not about retaliation. The jury concluded as much. <u>ROA.689-91</u>. The jury's decision underscores that Swor harbored no ill will to White, despite the issue he had raised. In fact, he took immediate action to see if the allegation was correct, which he determined that the report was not. It should be kept in mind that this alleged statement was not made by Mickey, but was reported to White third hand by another.

### E. Not a Case of Failing to Investigate Properly.

This case is not about Mickey conceding that he should have investigated something else about White. This is not a case of theft; or an infraction of the rules; it is not about bad behavior by Robert justifying a full investigation, such as he should lose his job. *See Owens,* <u>33 F. 4th at 828-30</u> (employer's investigation was adequate, though not as plaintiff

might have "preferred": investigation issues must show that the reasoning was "*unbelievable*") (emphasis in text). *Compare Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1159 (10th Cir. 2008) (employer failed to interview supervisor when conducting investigation about employee's infraction; supervisor undercut the company's rationale).

Mickey was not gathering facts as in the usual case of alleged bad action resulting in termination. His job was quite different. He came to Patriot, like an outside consultant, to review and effect organizational change, as needed ("to bring it up to the level we needed as a larger company"). ROA.1712. That included a lot of steps, among which were the introduction of numerous new processes and changes in personnel, including Robert. ROA.1713-14. There is nothing to suggest that Mickey knew he had to interview others to come to his expert fabrication conclusion; he never was asked that and he made no admission that his investigation was lacking. As the *Owens* court correctly differentiated a case,

> In *Gorzynski*, the relevant decisionmaker conceded that additional witnesses should have been interviewed before terminating the plaintiff based on a complaint. 596 F.3d at 108. There is no such concession here. *Martin* and *Tisdale* rely on Sixth Circuit tests, neither of which has been adopted in this circuit. *Martin*, 548 F.3d at 414–15; *Tisdale*, 415 F.3d at 529–30.

*Owens,* 33 F. 4th at 829-30.

### F. This Is Not a Case of Inconsistent Reasons.

This case is not about so-called shifting or inconsistent reasons. *See January,* 74 F.4th at 655 (comparing *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002). Furthermore, there is no evidence that any rationale changed given the timing of when the rationale was provided. *See* 187 Fed. Appx. 350, 359 (5th Cir. 2006)

While Plaintiff may want to argue that Mickey's testimony about the double work at the Patriot site and at a sub-fabricator has changed (Robert has argued that Mickey asked for the work to go to the sub-fabricator, Kennedy), that argument misses the point of Mickey's conclusion—that the double work issue was something that Robert should have been aware of and fixed. Mickey, the expert in the area of fabrication, amply demonstrated that he viewed White's management as not the best fit for the Patriot Fab Shop for several reasons. Those were his reasons from beginning to the end, and he never contradicted himself. Furthermore, Parley agreed with Mickey's assessment.

Again, that one may disagree with Patriot's efforts in reorganizing the company in 2019, those decisions should not be judged by this Court.

*Owens,* <u>33 F. 4th at 826</u>. ("But employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [the Employer] made a wise or even correct decision to terminate Owens." (citing *Bryant v. Compass Grp. USA Inc.*, <u>413 F.3d 471, 478</u> (5th Cir. 2005). *See also Cherry,* <u>2022 WL 3636606</u>, at *7. Moreover, "Employers are "entitled to be unreasonable" in terminating their employees "so long as [they] do[ ] not act with discriminatory animus." *Sandstad v. CB Richard Ellis, Inc.*, <u>309 F.3d 893, 899</u> (5th Cir. 2002)." *Owens,* <u>33 F.4th at 826</u>. A finding of a *prima facie* case does not mean the action was discriminatory. *See Reeves*, <u>530 U.S. at 148</u>. *Owens,* <u>33 F.4th at 826</u>.

Again, the fact that some people disagreed with Mickey's conclusion is not the issue. *Owens,* <u>33 F.4th at 831</u>("disputes over an employer's assessment of an employee's performance do not create issues of fact. *Salazar*, <u>982 F.3d at 389</u>."). Mickey provided that opinion as he was asked to do, as a neutral coming from a well-managed fabrication business at Trinity, to review if changes might be made in the Patriot Fab Shop, and that's all he found. Thus, pretext is not found in the assessment and advice that Mickey provided Parley, who essentially agreed. And on that subjective opinion, Patriot may operate and this is

particularly true when there is "scant" or no evidence of discrimination. *Owens*, 33 F. 4th at 831.

### G. Similarity to *Owens*.

This case is very similar to *Owens*, when the main decisionmaker drew his conclusions from a number of sources, including stories of co-workers complaining about Owens, who reportedly would fix problems on her own without "helping her team members develop by handling those situations themselves." *Id.* at 830

In the process of his review, Mickey, too, heard complaints from people working with Robert (the "job scared" remarks, ROA.1657), but he, like the manager in *Owens*, was not seeking to discipline or terminate Robert due to those Shop complaints.  Mickey's purpose was quite different.  It was an assessment based on his years of experience if the Shop overall needed improvement, and he found it did for several reasons. The movement of Robert out of the Shop was but one change Mickey proposed, and others included streamlining the software implementation and bringing in many new processes to up the manufacturing game at Patriot.  Patriot sought this expertise from the person at Trinity who had the greatest knowledge of how fabrication

should run.  In short, this is not a case about deficiencies in an investigation of an employee's infraction; it is only a case of a Company assessing its overall organization and process, for future improvement.

In sum, lacking evidence of pretext, the Plaintiff's claims were not supported, and the judgment should be reversed.

## CONCLUSION

No evidence demonstrates that Mr. White's race factored into his Patriot separation.  Mr. White has no evidence (1) that Patriot discharged him (he quit), or (2) that race motivated Patriot's (Parley's) proffered reason for talking with Mr. White and offering him three work options in late October 2019 (much less Mr. Swor's conclusion that Mr. White should not continue as the shop manager).  Or that he was treated differently from someone else.  Patriot seeks to have this Court reverse the district court's decision on the motion for a directed verdict, and to reverse the judgment based on a faulty jury conclusion, given that the evidence is insufficient as matter of law.

Dated:  November 9, 2023          Respectfully submitted,

                                  */s/ Andrea M. Johnson*
                                  Andrea M. Johnson
                                  *Attorney-in-Charge*
                                  Texas State Bar No. 10679600
                                  Email:  ajohnson@krcl.com
                                  KANE RUSSELL COLEMAN LOGAN PC
                                  5151 San Felipe Street, Suite 800
                                  Houston, Texas 77056
                                  Phone: (713) 425-7433
                                  Fax: (713) 425-7700

                                  **ATTORNEY FOR DEFENDANT
                                  PATRIOT ERECTORS LLC**

## CERTIFICATE OF SERVICE

I certify that on November 9, 2023, the foregoing Brief was filed electronically using the Court's CM/ECF system, which will give notice of the filing to counsel for Appellee.

I further certify that (1) the required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

I further certify that I will mail the correct number of paper copies of the foregoing document to the Clerk of the Court when requested.

/s/ Andrea M. Johnson
Andrea M. Johnson

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(s)(7)(B)(i) because this brief contains 10,970 words in the text and 58 words in footnotes, for a combined total of 11,028. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font size 14.

/s/ Andrea M. Johnson
Andrea M. Johnson